UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JEFFREY GUY RINGLE,

                 Petitioner,                 Case No. 1:13-cv-759

v.                                       Honorable Gordon J. Quist

MARY BERGHUIS,

                 Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Jeffrey Guy Ringle is incarcerated with the Michigan Department of Corrections (MDOC) at the Earnest C. Brooks Correctional Facility (LRF) in Muskegon County, Michigan. On November 16, 2007, a jury of the Calhoun County Circuit Court found Petitioner guilty of the following offenses: first-degree murder, Mich. Comp. Laws § 750.316(1)(a); felon in possession of a firearm, Mich. Comp. Laws § 750.224f; carrying a concealed weapon (CCW), Mich. Comp. Laws § 750.227; and two counts of possession of a firearm during the commission of a felony (felony firearm), Mich. Comp. Laws § 750.227b.[1] On December 10, 2007, the court sentenced Petitioner as a third habitual offender, Mich. Comp. Laws § 769.11, to life in prison for the murder conviction, 57 to 120 months' imprisonment for the felon-in-possession conviction, 57 to 120 months for the CCW conviction, and 2 years for each felony-firearm conviction.

---

[1] The jury also convicted Petitioner of felony murder, Mich. Comp. Laws § 750.316(1)(b), armed robbery, Mich. Comp. Laws § 750.529, and two additional counts of felony firearm.  However, those counts were dismissed at sentencing.

Petitioner appealed his conviction to the Michigan Court of Appeals and the Michigan Supreme Court.  The Michigan Court of Appeals denied all issues but one.  It remanded the case to the circuit court to correct Petitioner's sentence so that the CCW sentence would run concurrently with, not consecutively to, the felony-firearm sentences.  On December 21, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded that the issues presented should be reviewed by that court.

Petitioner filed a motion for relief from judgment in state court on January 26, 2011.  The trial court denied the motion on February 7, 2011.  He appealed that decision, and the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal on November 29, 2012, and June 25, 2013, respectively.

On or about December 2, 2013, Petitioner filed an amended habeas corpus petition raising eight grounds for relief, as follows:

I.      Ineffective assistance of appellate counsel [due to] (1) the failure to raise the significant, and meritorious issues raised in this petition during [Petitioner's] appeal of right.  (2) Appellate counsel failed to properly preserve Petitioner's federal constitutional claims on the two issues counsel raised on [Petitioner's] appeal of right, and . . . "prejudice" resulted thereby.

II.     The state suppressed relevant evidence [in] violation of *Brady v. Maryland*.

III.    Petitioner was denied his state and federal due process [rights] to a fundamentally fair trial when the trial court erroneously permitted the prosecution to introduce "other acts" evidence in violation of FRE 404(b) and MRE 404(b) which there was no rationale for admission of this evidence other than to prove the "bad char[a]cter" of [Petitioner].

IV.     Petitioner was denied his state a federal due process [rights] where the prosecution commented on post-arrest (*Miranda*) silence.

V.      Petitioner was denied his state and federal constitutional right to due process, and equal protection [where] the prosecution was erroneously allowed to enter into evidence a booking photograph (mug shot) of [Petitioner] and trial counsel was ineffective for not objecting to the deliberate elicitation of witnesses by the prosecutor that [Petitioner] was incarcerated.

2

VI.   Petitioner was denied his due process and a fair trial in violation of the Fourteenth Amendment . . . where several prosecution witnesses falsely testified to having received no consideration for their testimony . . . [and] the prosecution knew, or should have known the testimony[ie]s were false and failed to correct them[.]

VII.   Petitioner was denied his state and federal constitutional right to due process, equal protection, and confrontation [where] the trial court erroneously ruled that the testimony of one unavailable witness could be read to the jury, and the testimony of the deceased could be given by another witness.

VIII.   Petitioner was denied his due process and Sixth Amendment right to effective assistance of trial counsel.

(Am. Pet., ECF No. 38, PageID.549-559.)

Respondent has filed an answer to the petition (ECF No. 11) stating that the grounds should be denied because they are meritless and/or procedurally defaulted. Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless. Accordingly, I recommend that the petition be denied.

## **Background**

Petitioner's conviction arose from the shooting death of Chris Arnett on May 18, 2002, in CD's Party Store in Burlington, Michigan. Arnett owned the store, which was on the first floor of the building. He lived on the second floor of the building with his girlfriend, Karen Fowler.

Fowler testified that, on May 18, Arnett opened the store at 8:00 in the morning to work the first shift. Between 11:30 am and 12:30 pm, Arnett asked her to run the store so that he could go and make a deposit at the bank. (Trial Tr. 250.) [2] He was gone for about half an hour. (*Id.*) When he returned, Fowler went back to their apartment above the store. (*Id.* at 251.) A

---

[2] There are eight volumes of trial transcripts, corresponding to the eight days of trial. (*See* ECF Nos. 17-24.) The pages of the entire trial transcript are numbered sequentially, from the first page of the first volume to the last page of the last volume, so the court will simply refer to the page number when citing the trial transcript.

while later, someone knocked on her door and told her that Arnett had been shot.  (*Id.* at 252.)  She went down to the store and saw that Arnett had been fatally shot in the head.  The police subsequently determined that the bullet that killed Arnett came from a .38 or .357 caliber gun.  (*Id.* at 930.)

Jesse Schwark is Petitioner's step-brother.  He testified that he had been to the CD's Party Store on at least one occasion with Petitioner.  (*Id.* at 365.)  According to Schwark, Petitioner owned several guns, including a .357 caliber revolver.  (*Id.* at 368.)

A few days before the incident on May 18, Petitioner showed up at Schwark's house and asked to borrow some money.  (*Id.* at 374-75, 378.)  Petitioner was "stressed [and] jittery" at the time.  (*Id.* at 376.)  He claimed that he needed money because he was "going to lose his bass boat" and because he needed to go to Kentucky.  (*Id.*)  According to Schwark, Petitioner and his girlfriend, Della Harris, had gone to Kentucky several times to sell Oxycontin pills.  (*Id.* at 386.)  After Schwark refused to give him money, Petitioner became angry and pulled out a pistol and started waving it around.  Petitioner claimed that he was "going to rob someplace if somebody didn't loan him some money."  (*Id.* at 377.)

Della Harris testified that she started dating Petitioner in 1995.  (*Id.* at 403.)  In 1998, he started abusing her, verbally and physically.  (*Id.* at 409-10.)  Sometimes he threatened her with a gun.  (*Id.* at 413-14.)  In 2001, they started having financial problems because they were spending their money on drugs.  (*Id.* at 416.)  By the end of 2001, they had fallen behind on their house payments, and by May 2002 their electricity had been shut off because they did not pay their utility bills, so they moved in with Petitioner's cousin, Robert Gifford.

The day before May 18, Gifford heard Petitioner say that he needed money and that he might "rob somebody or something if he could get away with it." (*Id.* at 572.) Gifford knew that Petitioner possessed two pistols, a .22 and a 9 millimeter. (*Id.* at 571.)

On the morning of May 18, Petitioner told Harris that he wanted to go to back to their house to collect a change of clothing. She went with him and her boys to the house. She saw Petitioner go into their bedroom by his gun cabinet. She heard a noise, but she did not see him open the cabinet. (*Id.* at 423.) After Petitioner came out the bedroom, he told them that they were going to leave, so they climbed into their blue Chevy Suburban. Petitioner stated that he wanted to buy some cigarettes, but that did not make sense to Harris because they did not have any money. (*Id.* at 424.) He told Harris to drive to CD's Party Store. They had been there a day or two earlier, when Petitioner went into the store and then came back out without buying anything. (*Id.* at 426.) On May 18, they did not take the usual route to the store because Petitioner stated that he wanted to go "the back way." (*Id.* at 439.)

After arriving at the party store, Petitioner went inside for a few minutes and came back out with a six-pack of beer. (*Id.* at 435.) He "hurried" into the car, telling Harris, "Let's get the fuck out of here." (*Id.* at 435-36.) After they left the store, Petitioner repeatedly told Harris that he "fucked up." (*Id.* at 436.) He was "hysterical and nervous." (*Id.* at 437.) Later, after they returned to their house, she saw Petitioner lock the gun cabinet in their bedroom. (*Id.* at 443.) She asked him what was wrong; he told her to "'Just shut the fuck up,' and get the fuck out of there[.]" (*Id.*) Later that day, Petitioner told Harris that he wanted to go get something to eat. She asked him how they could do that without money, and he told her that "he had gotten money from Chris." (*Id.* at 444.)

Harris' son Joshua recalled being in the car at the party store with Petitioner and his mother.  (*Id.* at 820.)  He testified that Petitioner came out of the store, got in their vehicle, started swearing a lot, and then "took off" quickly, causing the tires to squeal.  (*Id.*)

Toward the end of the month, Petitioner told Harris that he had to "get the fuck out of Michigan."  (*Id.* at 448.)  They left where they were staying and drove down to Kentucky. Petitioner paid for their expenses.  Harris asked where he got the money, and he told her that he "shot Chris."  (*Id.* at 451.)  He threatened to kill Harris and her kids if she told anyone.  (*Id.*)

The first time that Harris had contact with the police after Arnett's murder was when she and Petitioner were arrested in Kentucky.  (*Id.* at 453.)  On May 28, Detective Sergeant Spurlock of the Kentucky State Police stopped Petitioner and Harris in their vehicle after he noticed their vehicle weaving between lanes.  (Tr. 773.)  When Petitioner spoke, Spurlock noticed that Petitioner's speech was slurred and his movements were slow and lethargic.  Spurlock arrested Petitioner for driving under the influence.  (*Id.* at 774.)  Petitioner was placed in the Pike County Detention Center.  Over the objection of Petitioner's counsel, the court admitted a photograph of Petitioner when he was booked into the detention center.

According to Harris, Petitioner was incarcerated for several months.  (*Id.* at 532.) She did not tell the police about Petitioner's conduct in relation to Arnett's murder because she was afraid that he would kill her if he found out about it.  (*Id.* at 470.)

Mitchell Messer met Petitioner a few years after the incident at CD's Party Store, when Messer bought some Oxycontin pills from Petitioner.  Messer testified that he once drove to CD's Party Store with Petitioner to buy a drink.  Petitioner refused to go inside the store, so he stayed in the car while Messer went inside to make the purchase.  (*Id.* at 713.)  After they drove away, Petitioner confessed to Messer that he had robbed the store and "wasted a guy."  (*Id.* at 714.)

6

Petitioner did not want to go into the store because he was worried that someone would recognize him.  (*Id.*)

On several other occasions, Petitioner suggested that he and Messer rob a store and a truck stop.  (*Id.* at 715-16.)  Petitioner claimed that it would "be a piece of cake" and that he had "robbed places before over in the suburbs of Detroit and around."  (*Id.* at 716.)

Petitioner also spoke to Messer about Harris.  Petitioner stated that he was worried that Harris was "going to talk."  (*Id.* at 718.)  Petitioner claimed that he was going to "do her in." (*Id.*)  According to Messer, Petitioner claimed that he had once beaten someone to death in Kentucky with a .357 Magnum.  (*Id.* at 719.)  On cross-examination, Messer acknowledged that he did not like Petitioner because Petitioner stole several thousand dollars from Messer.  (*Id.* at 728.)

Daniel Shepherd also testified about incriminating statements that Petitioner made. Shepherd met Petitioner in October 2003, when Shepherd sold Petitioner some Oxycontin pills. (*Id.* at 599, 602.)  On one occasion, Petitioner told Shepherd that he killed the owner of CD's Party Store (which by then had changed its named to Burlington Party Store) while "robbing his ass." (*Id.* at 604.)

Shepherd's sister Kathy Shepherd offered testimony similar to that of her brother. Petitioner once told Kathy that he went into a store and "the guy made him mad and he shot him and took beer and cigarettes."  (*Id.* at 904.)

Dallas Blankenship testified at a pre-trial evidentiary hearing, and the prosecutor presented his testimony from that hearing to the jury because Blankenship was not available to testify at the time of trial.  Blankenship testified that he knew Petitioner before Petitioner started dating Della Harris.  (Evidentiary Hr'g Tr. 5-6, ECF No. 16.)  After Petitioner started dating Harris,

7

he became "hooked on drugs."  (*Id.* at 6.)  Blankenship was taking Oxycontin pills at the time for

a medical condition.  (*Id.* at 7.)  On several occasions, Harris asked Blankenship for some pills, on

behalf of Petitioner.

Blankenship was aware that Petitioner possessed several firearms, including a large

"Dirty Harry" revolver.  (*Id.* at 11.)  About a week before Petitioner killed Arnett, Petitioner walked

into Blankenship's home uninvited, took Blankenship's toolbox, and started to leave.  (*Id.* at 12.)

Blankenship confronted Petitioner and Petitioner apologized, saying, "I messed up."  (*Id.* at 13.)

Blankenship saw that Petitioner had his revolver with him.  (*Id.*)

## **Analysis**

### I.     AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court

convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-

94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated

pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on

the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court

proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v.*

*Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v.*

*Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.

2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## II.    False Testimony and/or Evidence Withheld (Habeas Issues II & VI)

Petitioner contends that the prosecutor withheld material evidence.  Respondent contends that this claim is procedurally defaulted and meritless.  Rather than address the issue of procedural default, I will go straight to the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).

According to *Brady v. Maryland*, 373 U.S. 83 (1963), "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  "There are three components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 281 (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)).  "A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

Alternatively, Petitioner argues that the prosecutor deprived him of a fair trial by knowingly presenting false testimony, citing *Giglio v. United States*, 405 U.S. 150 (1972) and *Napue v. Illinois*, 360 U.S. 264 (1959).  *See Giglio*, 405 U.S. at 153 ("[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'");  *Napue*, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment[.]").  "'The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).  To succeed on such a claim, Petitioner "'must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.'"  *Id.*

Petitioner's *Brady/Giglio* claim rests upon his belief that witnesses Daniel and Kathy Shepherd entered into agreements with the government to receive reductions in their federal sentences in exchange for their testimony against Petitioner.  He asserts that the prosecutor improperly withheld evidence of these agreements and allowed them to testify falsely that they were not promised, and did not expect to receive, a benefit for their testimony.

### A.  Background

At the time of trial, Daniel Shepherd was in federal prison serving a 17-year sentence for conspiracy to deliver Oxycontin.  (Trial Tr. 599.)  Shepherd testified that he was not promised anything in exchange for his testimony.  (*Id.*)  On cross-examination, he testified that he

11

made a "proffer" to the government in 2006, and told them that he had information about Petitioner.  (*Id.* at 615-16.)  He acknowledged being told by his attorney that a proffer could result in a reduction of his sentence.  (*Id.* at 617.)  He also acknowledged signing a plea agreement requiring him to disclose information about others in exchange for the dismissal of certain charges against him.  (*Id.* at 623.)  In addition, he acknowledged that, at his federal sentencing hearing, the prosecutor indicated that he anticipated filing a Rule 35 motion to obtain a reduction in Shepherd's sentence if Shepherd cooperated with the government.  (*Id.* at 625.)  However, Shepherd denied that he was testifying against Petitioner in order to benefit his sentence.  (*Id.* at 620-22.)  He claimed that he was doing so because of his plea agreement, which required him to disclose information about others.  (*Id.* at 623.)

Like her brother, Kathy was also serving a federal sentence for conspiracy to deliver Oxycontin.  At Petitioner's trial, she testified that she was not promised anything in exchange for her testimony against Petitioner, and she did not expect to receive anything for it.  (*Id.* at 900, 911.)

On November 1, 2007, about two weeks before Kathy testified,[3] the United States Attorney for the Western District of Michigan filed a Rule 35 motion in her criminal case, requesting that she receive a reduction in her federal sentence due, in part, to the fact that she "disclosed information about a homicide and the fact that her brother Daniel had information about who committed the homicide. . . .  Daniel was used as a witness at the homicide preliminary examination and is expected to be a trial witness as well."  (*United States v. Shepherd*, No. 1:06-cr-85 (W.D. Mich.), United States' Sealed Rule 35(b) Mot. for Reduction of Sentence, ECF No. 82-2, PageID.359.)  The U.S. Attorney also mentioned that Kathy provided assistance in obtaining the drug conviction against her brother Daniel and that she testified against the physician who

---

[3] Kathy Shepherd testified on November 13, 2007.

supplied her and Daniel with Oxycontin.  (*Id.*, PageID.358-359.)  The Court granted this motion on November 7, 2007, about a week before Kathy testified in Petitioner's case.

Something similar occurred in Daniel Shepherd's criminal case, but at a much later date.  On February 23, 2012, several years after Petitioner's trial, the U.S. Attorney for the Western District of Michigan filed a Rule 35 motion asking the federal court to reduce Shepherd's sentence because of his cooperation with the government.  Among other things, Shepherd disclosed "important information about [Petitioner's] possession of weapons, which established [Petitioner's] access to firearms and specifically rebutted [Petitioner's] claims regarding access to firearms.  [In addition,] Daniel testified at both the preliminary exam and the trial in Calhoun County."  (*United States v. Shepherd*, No. 1:06-cr-85 (W.D. Mich.), United States' Br. in Supp. of Mot. for Reduction of Sentence, ECF No. 92.)  The Court granted the motion on April 20, 2012.

## B.  State Court Determination

When Petitioner presented his *Brady/Giglio* claim to the Calhoun County Circuit Court, he relied solely on the Rule 35 motion filed in Kathy Shepherd's criminal case to support his assertion that the Shepherds made a deal with the government.  (*See* App'x A to Mot. for Relief from J., ECF No. 30.)  He did not offer any facts or evidence pertaining to Daniel Shepherd.

The trial court rejected Petitioner's claim as follows:

> To "prove" [his] allegation [that Kathy Shepherd entered into a deal with the prosecutor for her testimony at trial], defendant offers a motion and order in federal court granting Kathy Shepherd a reduction in her federal sentence imposed in November 2006 for, among other things, disclosing information about a homicide and the fact that her brother Daniel had information about who committed the homicide.  The witness Shepherd testified in the defendant's trial a year after she was sentenced in federal court.  The "proof" offered by the defendant does not in any way contradict Ms. Shepherd's testimony that she was not offered consideration as part of a deal with the prosecutor for her testimony in the defendant's trial.  She had long been sentenced when she testified at defendant's trial and the fact that the federal authorities moved to have her federal sentence reduced for her cooperation in federal prosecutions (the Ringle case was thrown in

13

as another factor and apparently a minor one at that) does not equate to a plea bargain or a showing of a grant of consideration for testimony in the defendant's trial.  It certainly does not show prosecutorial misconduct . . . .  Even without Ms. Shepherd's testimony there was ample evidence supporting the jury's verdict in defendant's trial.  Even if there had been consideration for Ms. Shepherd's testimony, there is no question that defendant would not have had a reasonably likely chance of acquittal given the other evidence in the case.

(2/7/2011 Calhoun Cty. Cir. Ct. Order 3-4, ECF No. 28.)

## C.  Analysis

### 1.  Kathy Shepherd

The state court's determination of the facts was not unreasonable.  Kathy Shepherd received a reduction in her sentence for cooperating with the government in a number of ways, one of which was disclosing to the police that her brother Daniel had useful knowledge about the murder of Chris Arnett.  The government's Rule 35 motion in her federal case does not indicate that she received, or could expect to receive, any benefit for *testifying* against Petitioner.  The motion does not even mention Kathy's expected testimony.  Thus, Petitioner's evidence does not in any way contradict her statements that she was not promised anything for her testimony and did not expect to receive anything for it.

Likewise, the state court reasonably determined that the Rule 35 motion does not establish that Kathy entered into a "deal" with the government in exchange for her testimony.  Petitioner's belief in the existence of such a deal is especially implausible considering that Kathy testified *after* she had already received the reduction in her sentence.

Furthermore, the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law.  The trial court did not cite any case law in its analysis.  Its assertion that Petitioner "would not have had a reasonably likely chance of acquittal given the other evidence in the case" is similar to the prejudice standard in *Bagley* for *Brady* claims,

14

which asks whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *Bagley,* 473 U.S. at 682, but is slightly different from the materiality standard in *Giglio* for false-testimony claims, which "ask[s] only 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Rozencrantz v. Lafler*, 568 F.3d 577, 584 (6th Cir. 2009) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)).  However, neither standard is of any help to Petitioner because he has failed to establish an essential element of a *Brady* claim or a false-testimony claim.  He failed to demonstrate that there was an agreement that the government failed to disclose, or that any of Kathy Shepherd's testimony was false.

In addition, the "ample evidence" mentioned by the state court defeats Petitioner's claim under both the prejudice standard in *Bagley* and the materiality standard in *Giglio*.  Kathy Shepherd testified that Petitioner told her that he robbed a store and shot someone, but Petitioner made similarly incriminating statements to Della Harris and Mitchell Messer.  Consequently, the absence of evidence about the reduction in Kathy Shepherd's sentence, and any falsity in her statements that she was not promised and did not expect to receive a benefit for her testimony, could not have affected the judgment of the jury because other witnesses provided essentially the same evidence as she did.

### 2.  Daniel Shepherd

The state court did not expressly address Petitioner's contention that Daniel Shepherd made an agreement with the government, probably because Petitioner did not offer any facts or evidence to support it.  Apparently, Petitioner did not discover the Rule 35 motion filed in Daniel Shepherd's case until March 2013, after he appealed the denial of his motion for relief from judgment to the Michigan Court of Appeals.  (Am. Pet., PageID.611.)  Thus, it appears that he has

not exhausted this issue by presenting it at all levels of the state courts.  *See* 28 U.S.C. § 2254(b)(1) (requiring prisoners to exhaust their claims in state court before bringing their claims in federal court).

In any event, Petitioner's claim pertaining to Daniel Shepherd is meritless for reasons similar to those discussed with respect to Kathy Shepherd.  The filing of a Rule 35 motion by the government is not evidence of an agreement with, or promise by, the government for a reduction in Shepherd's sentence in exchange for his testimony in Petitioner's case.[4]  Indeed, the Rule 35 motion is entirely consistent with Shepherd's testimony at trial, in which he acknowledged that the federal prosecutor anticipated filing such a motion if Shepherd complied with his plea agreement.  Thus, the Rule 35 motion does not demonstrate that the state prosecutor knowingly presented false testimony, let alone that the prosecutor failed to disclose a deal between Shepherd and the government.

In addition, Petitioner has failed to satisfy the prejudice and materiality standards in *Bagley* and *Giglio* because several other witnesses, including Della Harris and Mitchell Messer, presented more detailed testimony about Petitioner's actions and incriminating statements.

Thus, for all the foregoing reasons, Petitioner's claim is meritless.

---

[4] Daniel Shepherd's plea agreement, which was mentioned at Petitioner's trial, makes this clear:

> The U.S. Attorney's Office agrees to make a good faith evaluation of the Defendant's cooperation under this agreement in determining whether to file a motion for reduction of sentence pursuant to USSG 5K1.1 and Rule 35(b) of the Federal Rules of Criminal Procedure. . . . *The determination of whether Defendant has provided substantial assistance to the United States, or to designated state or local law enforcement authorities, will be made in the sole discretion of the U.S. Attorney's Office.  Defendant fully understands that this paragraph is not a promise by the Government to file such a motion,* but, rather, a promise to use good faith in evaluating the Defendant's assistance to the Government in the prosecution of others to determine whether a motion should be filed. . . .

(*United States v. Shepherd*, No. 1:06-cr-85 (W.D. Mich.), Plea Agreement, ECF No. 62 (emphasis added).)

III.    "Other Acts" Evidence (Habeas Issue III)

Petitioner claims that he was denied a fundamentally fair trial because the state court permitted the prosecutor to introduce evidence of "other crimes, wrongs, or acts" that he committed. (Am. Pet., PageID.593.) Specifically, Petitioner refers to testimony that he used drugs and was addicted to Oxycontin; he physically abused Harris; he was known to carry a pistol; he entered Blankenship's home with the apparent intent to steal a toolbox, carrying a large pistol or "Dirty Harry" gun; he told Messer he "pistol whipped" someone in Kentucky and robbed convenience stores; he was once seen carrying a .45 caliber Lumina pistol; and he was arrested in Kentucky. Petitioner asserts that the court's decision to admit this evidence violated Michigan Rule of Evidence 404(b) and denied him due process.

The Michigan Court of Appeals rejected Petitioner's challenge under Rule 404(b) because all the evidence identified by Petitioner was admitted for proper purposes, such as demonstrating Petitioner's motive for the offense, Petitioner's general intent, and Petitioner's identity as the perpetrator (i.e., someone who possessed a weapon like the one used on Arnett), or explaining why Harris did not immediately report Petitioner's criminal conduct to the police. *See People v. Ringle*, No. 283239, 2009 WL 1830737, at *4-5 (Mich. Ct. App. June 25, 2009). Moreover, the state court determined that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. *Id.* at *5.

When Petitioner raised this issue as a *due process* claim in his motion for relief from judgment, the trial court determined that the issue had already been decided against him by the Michigan Court of Appeals. (2/7/2011 Calhoun Cty. Cir. Ct. Op & Order 2, ECF No. 28.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502

17

U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. Thus, to the extent Petitioner's claim is premised solely on the state court's asserted failure to follow state evidentiary rules, he does not state a cognizable claim.

His claim fares no better as a due process claim. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

"There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of other acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*,

519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.

Furthermore, the state court reasonably determined that the evidence challenged by Petitioner was relevant to his case.  "[T]he Supreme Court has never held (except *perhaps* in the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial amounted to a violation of due process."  *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012).

In short, because there is no clearly-established law holding that the admission of evidence of a defendant's prior acts violates due process, Petitioner's claim is meritless.  In other words, the state court's decision rejecting his claim was not contrary to, or an unreasonable application of, clearly established law.  Thus, for all the foregoing reasons, Plaintiff's does not state a due process claim.

IV.    Commentary on Post-Arrest Silence (Habeas Issue IV)

Petitioner claims that the prosecutor improperly commented on Petitioner's post-arrest silence.  "'[I]t does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony[.]'"  *Doyle v. Ohio*, 420 U.S. 610, 619 (1976) (quoting *United States v. Hayle*, 422 U.S. 171, 182-83 (1975) (White, J., concurring)).  Put another way, "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances."  *Anderson v. Charles*, 447 U.S. 404, 408 (1980).

19

Where a *Doyle* violation has occurred, Petitioner is entitled to habeas relief only if the state's improper use of his post-*Miranda* silence "had a substantial and injurious effect of influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

The Michigan Court of Appeals summarized and resolved this claim as follows:

The Michigan Supreme Court has held that a defendant's silence at the time of arrest and after receiving *Miranda* warnings is not admissible for impeachment purposes. And police officers have a special obligation not to venture into forbidden areas that may prejudice the defense. However, the constitutional preclusion of evidence of the defendant's silence does not extend to a brief and oblique reference. Furthermore, an unresponsive, volunteered answer that injects improper evidence into a trial is generally not a ground for a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony.

Here, the police witness testified at trial regarding Ringle's statements to the police after he was advised of his *Miranda* rights. The following colloquy then took place:

Q. And is that the extent of your conversation with the defendant on that date?

A. Yeah, shortly after that he stated that—

Q. Ah—

A. Okay.

Q. 'Cause he has the right not to talk to you?

A. Yes, absolutely.

Q. Okay. And that's what happened?

A. Yes.

Q. Okay, but you understand that that's his absolute right, he can—

A. Absolutely.

This exchange suggests that the prosecutor was not inquiring into Ringle's post-*Miranda* silence, but was merely attempting to elicit a close-ended response from the police witness regarding whether the interview with Ringle had concluded. While the prosecution made general, clarifying comments that a defendant does not

have to speak to police, there was no testimony that Ringle invoked his right to silence in this case.  Finally, because the trial court instructed the jury that attorneys' statements or questions are not evidence, and because juries are generally presumed to have followed the instructions, there could be no error where such a curative instruction prevented any prejudicial effect.

Ultimately, we conclude that the single question and somewhat unresponsive testimony did not rise to the level of an inadvertent inquiry into Ringle's post-*Miranda* silence.

*People v. Ringle*, No. 283239, 2009 WL 1830737, at *2-3 (Mich. Ct. App. June 25, 2009) (footnotes with citations omitted).

Petitioner asserts that the trial record does not support the state court's factual findings, but he is wrong.  The state court reasonably determined that there was no testimony that Petitioner invoked his right to silence.  The prosecutor's statement is not testimony.  In addition, the state court reasonably determined that the trial court issued an instruction that could have cured a possible inference from the prosecutor's statements about an invocation of silence, because the court instructed the jury that the attorney's statements and questions are not evidence.  (*See* Trial Tr. 1385.)  Thus, the state court's decision was not based on an unreasonable determination of the facts.

Moreover, the state court's decision was not contrary to, or an unreasonable application of, clearly established law as defined by the Supreme Court.  Petitioner fails to identify any Supreme Court case with facts even remotely similar to his case.  Indeed, there is no question that the prosecutor in Petitioner's case did not use an invocation of silence as a means to impeach Petitioner or to suggest that he is guilty.  *Cf. Greer v. Miller*, 483 U.S. 756, 764-65 (1987) ("The fact of [defendant's] post-arrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred in this case.").  There is no mention of an invocation of silence in the record, and the prosecutor did not

suggest anything by the fact that Petitioner's interview with the police ended, other than that Petitioner had a right not to talk to the police.

In addition, the prosecutor did not *attempt* to use an invocation of silence for improper purposes.  *See Greer*, 483 U.S. at 765-66 (analyzing an attempt to violate *Doyle* as a possible due process violation).  On the contrary, as the state court indicated, the prosecutor asked an open-ended question about whether the interview had concluded, and then made clear that Petitioner had the absolute right not to talk to the police.  If anything, the prosecutor attempted to dispel any improper inference from the fact that the interview ended.  *Cf. United States v. Thompson*, 192 F. App'x 488, 492 (6th Cir. 2006) ("'*Doyle* does not impose a prima facie bar against any mention whatsoever of a defendant's [invoking his *Miranda* rights], but instead guards against the exploitation of that constitutional right by the prosecutor.'" (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991)).

Furthermore, taking into account the *Brecht* standard, Petitioner's claim is plainly meritless.  The prosecutor's alluded to the possibility that Petitioner ended the police interview by remaining silent, but only did so when *attempting to make clear that Petitioner had a right not to speak to the police*.  The prosecutor did not raise the issue to paint a negative inference about Petitioner, and Petitioner does not point to any other instance during the trial when the prosecutor mentioned Petitioner's silence.  Under these circumstances, the prosecutor's statements could not possibly have had a substantial and injurious effect on the jury's verdict.

Thus, the state court's decision was not contrary to, or an unreasonable application of, clearly established law.

V.    Admission of Photograph (Habeas Issue V)

Petitioner claims that he was deprived of due process and equal protection when the court admitted, over the objection of Petitioner's counsel, a "booking photograph" of Petitioner from the Pike County Detention Center. (Am. Pet., PageID.604.) Petitioner contends that the government's only purpose in submitting the photograph was to "show that the jury what Petitioner looked like when on Oxycontin's, which was irrelevant to the case[,]" and to show that Petitioner was incarcerated in Kentucky when he was questioned for murder. (*Id.*, PageID.606.) In other words, Petitioner contends that the prosecutor used the photograph to demonstrate that Petitioner had a bad character and that he had the propensity to commit the crime with which he was charged. Relatedly, Petitioner claims that his counsel was ineffective for failing to object to testimony that Petitioner was incarcerated in Kentucky and Michigan.

Petitioner raised the foregoing issues in his motion for relief from judgment, but the trial court determined that they were meritless and were procedurally defaulted because Petitioner failed to raise them on appeal, and failed to demonstrate good cause for his failure to do so. (2/7/2011 Calhoun Cty. Cir. Ct. Op & Order 2-3.) I discern no error in the state court's decision on the merits, let alone one that makes that court's decision contrary to clearly established law as determined by the Supreme Court.

### A. Photograph

The trial court ostensibly admitted the photograph because it was relevant to support the prosecutor's theory that Petitioner was addicted to Oxycontin around the time that he killed Arnett, insofar as it showed what he looked like when he was arrested, about ten days after the murder. (*See* Trial Tr. 777.) Petitioner's addiction was relevant to his motive for entering CD's Party Store to rob and kill Arnett.

Petitioner's argument that the state court should not have admitted the photograph is similar to his argument regarding the admission of "other acts" evidence under Rule 404(b) of the Michigan Rules of Evidence.  First, he relies upon a rule of evidence rather than a rule of constitutional law.  He argues that the state court did not satisfy a three-part test used in the First Circuit to determine whether a defendant's "mug shot" should be admitted.  (Am. Pet., PageID.605 (citing *Pagan v. Dickhaut*, 578 F. Supp. 2d 343 (D. Mass. 2008).)  This argument fails because the First Circuit's test is not binding on this Court, it is based on rules of evidence rather than constitutional rights, and it is not "clearly established law" from the Supreme Court.

Next, Petitioner argues that admission of the photograph deprived him of due process because it was improperly used as evidence of his bad character and propensity to commit a crime.  According to Petitioner, it revealed his drug use and his incarceration.  I addressed this same type of argument in Section IV.  In short, there is no Supreme Court precedent establishing that it is unconstitutional for a court to admit "propensity" evidence.  The *Old Chief* case cited by Petitioner (Am. Pet., PageID.606) examined the issue under the federal rules of evidence.  It did not address the issue in constitutional terms.  Thus, Petitioner has not demonstrated that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.

Moreover, the admission of the photograph could not have meaningfully prejudiced Petitioner, let alone denied him a fundamentally fair trial, because several witnesses testified that Petitioner was addicted to Oxycontin *and* that he was incarcerated for a period of time, even before the photograph was admitted into evidence.  Thus, the photograph may have helped confirm Petitioner's use of drugs near the time of the murder, but it did not reveal anything else about Petitioner's history of addiction and incarceration that the jury did not already know.  *Cf. Matthews v. Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003) ("The issue of the introduction of the mug shot

24

was basically inconsequential, in that little that is harmful or inappropriate was presented to the [fact-finder] that did not otherwise properly become known.").

## B.  Incarceration

Petitioner contends that his counsel was ineffective for failing to object to the testimony of Officer Spurlock and Officer Gandy insofar as they mentioned Petitioner's incarceration at different correctional facilities.  The state court declared that this issue, which was first raised in Petitioner's motion for relief from judgment, was meritless and procedurally defaulted.  The court also rejected Petitioner's assertion that he failed to raise the issue on appeal because his appellate counsel was ineffective.  The state court noted that appellate counsel is not ineffective for failing to raise a meritless issue.  (2/7/2011 Calhoun Cty. Cir. Ct. Op & Order 2-3.)

The same logic defeats Petitioner's claim that his trial counsel was ineffective.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide

range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

As for the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Counsel's conduct was not unreasonable.  There would have been no point in objecting to the testimony of Officers Spurlock and Gandy about Petitioner's incarceration because Della Harris had already testified that Petitioner was imprisoned for a period of time.  Thus, it would have been pointless to argue that further testimony confirming the fact of Petitioner's incarceration should be excluded because it was more prejudicial than probative.  Counsel was not ineffective for failing to raise a meritless objection.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).

Moreover, Petitioner cannot show prejudice.  His guilt is based on the testimony of two individuals who were present with him near the scene of the crime, who witnessed his statements and actions immediately before and after the event, as well as the testimony of other individuals who confirmed his motive, his access to the type of firearm used in the murder, and his incriminating statements.  Evidence that Petitioner was incarcerated at one time or another is not reasonably likely to have affected the outcome of his trial.

VI.    Out-of-Court Statements (Habeas Issue VII)

Petitioner asserts that he was deprived of due process, equal protection, and his "right of confrontation" when the trial court admitted testimony and statements from witnesses

26

who were not available to testify at trial.  For instance, Dallas Blankenship was not available to testify at trial, so the court allowed the government to present his testimony from an evidentiary hearing, over the objection of Petitioner's counsel.  (*See* Trial Tr. 871; Evidentiary Hr'g Tr., ECF No. 16.)  In addition, the trial court admitted the testimony of Terry McClughen, who claimed that he saw Arnett the day before he died, and Arnett "made a comment . . . about someone that'd come in and gave him a rash of shit about lending them money[.]"  Arnett told McClughen that this person's "brother lives right down the road[.]"  (Tr. 760.)  McClughen could not recall whether Arnett identified Petitioner by name, but another witness confirmed that Petitioner's brother lived on the road Arnett was referring to.

When ruling on the issue in response to Petitioner's motion for relief from judgment, the state court summarily rejected it along with Petitioner's other claims as "lacking in both factual and legal merit."  (2/7/2011 Calhoun Cty. Cir. Ct. Op & Order 2.)

### A.  Confrontation

Petitioner's chief complaint is that the admission of the foregoing testimony deprived him of his right of confrontation.   "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'"  *Crawford v. Washington*, 541 U.S. 36, 42 (2004).  "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  *Id.* at 68.

### 1.  Blankenship

Petitioner does not dispute that Blankenship was unavailable to testify at trial. Petitioner apparently contends that he did not have the opportunity to fully cross-examine and/or confront Blankenship.  However, as the trial court observed when Petitioner's counsel raised the

issue at trial, Petitioner had the opportunity to cross-examine Blankenship at the evidentiary hearing, and his attorney did just that.  (Trial Tr. 873; *see* Evidentiary Hr'g Tr. 15-27 (cross-examination).)  The trial court did not limit Petitioner's opportunity to cross-examine Blankenship in any way; the court even asked Petitioner's counsel whether he wanted to ask Blankenship additional questions at the hearing, and his counsel declined to do so.  (*See* Evidentiary Hr'g Tr. 33.)  Consequently, Petitioner was not deprived of his rights under the Confrontation Clause when the court admitted Blankenship's testimony at trial.  *Cf. California v. Green*, 399 U.S. 149, 165 (1970) (finding no Confrontation Clause violation where the defendant's counsel was not "significantly limited in any way in the scope or nature of his cross-examination of the witness [] at the preliminary hearing").  In other words, the state court's resolution of this issue was not contrary to, or an unreasonable application of, clearly established law.

### 2.  McClughen

Petitioner's trial attorney also objected to the admission of McClughen's testimony about Arnett's statements, arguing that they were hearsay.  The trial court overruled the objection, concluding that Arnett's statements were admissible for several reasons:  they were a present sense impression, Mich. R. Evid. 803(1); they were offered against a party by a declarant who was made unavailable by the party's actions, Mich. R. Evid. 804(b)(6); and they were about a material fact more probative on the point for which it is offered than other evidence that the proponent can procure, Mich. R. Evid. 804(b)(7).  (Trial Tr. 666-67.)

To the extent that Petitioner challenges the state's application of Michigan's rules of evidence, his claim is outside the scope of this Court's review because "federal habeas corpus relief does not lie for errors of state law."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

To the extent Petitioner contends that he was deprived of his right to confrontation, he does not state a claim because Arnett's statements to McClughen were not "testimonial."  The Confrontation Clause is only concerned with "formalized statements, such as affidavits, depositions, prior testimony, and confessions." *Williams v. Illinois*, 567 U.S. 50, 82 (2012).  "[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.'"  *Id.* at 83-84 (quoting *Michigan v. Bryant*, 562 U.S. 344, 359 (2011)).

Arnett did not make a formalized statement to McClughen for the primary purpose of accusing Petitioner or creating evidence for use at trial.  Instead, he made his statements in an informal setting.  Indeed, Arnett made his remarks before Petitioner even committed a crime against him.  Thus, the Confrontation Clause was not implicated by McClughen's testimony.

Moreover, even if there was an error, it was clearly harmless.  *See Delaware v. Van Arsdall*, 475 U.S. 463, 684 (1986) (holding that Confrontation Clause errors are subject to harmless-error analysis); *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003).  "[I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard in *Brecht*[.]"  *Fry v. Pliler*, 551 U.S. 112, 121 (2007).  In other words, an error is harmless unless it "had a substantial and injurious effect of influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 638.  "'The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot stand.'"  *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (emphasis omitted)).

When determining whether a Confrontation Clause error is harmless, the Court must consider the factors in *Van Arsdall*, including

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684; *Blackston v. Rapelje*, 780 F.3d 340, 359 (6th Cir. 2015).

McClughen's testimony about Arnett's statements was not important to the prosecution's case. It was largely cumulative and it did not directly implicate Petitioner in the murder. Assuming Arnett was referring to Petitioner, then McClughen's testimony placed Petitioner inside CD's Party Store on the day *before* the murder. However, Harris testified to essentially the same thing. She testified that she went to CD's Party Store with Petitioner on the day before the murder, and that he went into the store and came back out without purchasing anything. McClughen's testimony sheds some light on what Petitioner may have done when he was in the store on that day, but his testimony on this point (someone "gave [Arnett] a rash of shit about lending them money") is not entirely clear. It suggests that Petitioner asked Arnett for money. However, this is not surprising because other witnesses testified that Petitioner was desperate for money.

Far more important to the prosecutor's case was the evidence of Petitioner's actions *on the day of* the murder. Harris and her son provided those critical details, and she and others testified that Petitioner confessed to robbing and killing Arnett. Thus, even if the admission of McClughen's testimony violated the Confrontation Clause, Petitioner is not entitled to relief because the admission was harmless. It could not have had a substantial and injurious effect on the jury's verdict.

### B.  Due Process

Petitioner provides no analysis or support for his claim that admitting the testimony of Blankenship and McClughen deprived him of due process.  Moreover, "the Supreme Court has never held that the introduction of hearsay testimony violates the Due Process Clause."  *Susalla v. Harry*, No. 17-1783, 2017 WL 6420337 (6th Cir. Dec. 18, 2017) (citing *Desai v. Booker*, 732 F.3d 62, 630-31 (6th Cir. 2013)).  Accordingly, this claim is meritless.

### C.  Equal Protection

Petitioner's alternate claim that he was deprived of equal protection is wholly conclusory.  He provides no legal or factual support for this claim.

Accordingly, for all the foregoing reasons, Petitioner's claims in Habeas Issue VII are meritless.  He has not demonstrated that the state court's rejection of his claims was contrary to clearly established law.

VII.   Assistance of Trial Counsel (Habeas Issue VIII)

Petitioner claims that he was denied the effective assistance of trial counsel, in violation of his rights under the Sixth Amendment.

### A.  Constructive Denial of Counsel / Judicial Interference

Petitioner first claims that the trial court's rulings effectively deprived Plaintiff of the effective assistance of counsel.  Petitioner contends that the trial court interfered with his counsel's ability to represent Petitioner by permitting witnesses to testify about Petitioner's "uncharged crimes and bad character"; overruling counsel's objections to the admission of the booking photograph and to the testimony of McClughen and Blankenship; and denying counsel's motion for a mistrial, which was based on the prosecutor's comments about Petitioner's silence.  (Am. Pet., PageID.628-630.)

31

This claim is patently meritless.  None of the court's rulings prevented Petitioner's counsel from assisting Petitioner or representing him at trial.  The Sixth Amendment right to counsel does not guarantee favorable court rulings on defense objections and motions, or a favorable outcome from the jury.  Indeed, by raising objections and moving for a mistrial, Petitioner's attorney performed the role expected of counsel under the Sixth Amendment.

Petitioner cites *United States v. Cronic*, 466 U.S. 648 (1984), but that case is wholly inapposite.  Petitioner's counsel did not "entirely fail[] to subject the prosecution's case to meaningful adversarial testing," and Petitioner's case is not one in which "counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 & n.25.  Thus, *Cronic* does not apply.

### B.  Interlocutory Appeal

Petitioner asserts that his counsel was ineffective for failing to file an "interlocutory appeal."  (Am. Pet., PageID.631.)  This claim is meritless because Petitioner does not specify any valid issues that could have been raised in an interlocutory appeal.

### C.  James Harris

Petitioner contends that counsel was ineffective for failing to locate James Harris and present him as a witness for trial.  James is Josh Harris' older brother.  According to a police report, James remembered going to the party store along with his mother, brother, and Petitioner, but he did not remember Petitioner entering the store and coming out again.  (ECF No. 3-4, PageID.210.)  Also, he could not recall Petitioner hitting his mother or firing a gun by her ear, as his mother testified.

The state had listed James as a potential witness, but it was not able to produce him for trial.  Deputy Gandy was the one who interviewed James.  At the time, James was a "runaway,"

but Gandy was able to arrange an interview by contacting James' aunt and uncle.  (Trial Tr. 1113-14.)  Several weeks before trial, Gandy attempted to secure James' presence at trial by contacting James' aunt and uncle.  (*Id.* at 1116.)  He made several calls to them over the next few weeks, including the week before trial, but he did not receive a response.  He also contacted the Department of Social Services, but the department did not know James' whereabouts.  (*Id.* at 1117.)  Consequently, the prosecutor asked the court to excuse James from the government's witness list.  (*Id.* at 1176.)  Petitioner's counsel objected, but the court granted the request, finding that the prosecutor had exercised due diligence in attempting to locate him.  (*Id.* at 1178.)

Petitioner's counsel subsequently asked the court admit James' statement to the police, because James was not available as a witness.  The court denied the request because there was no record that Petitioner's counsel notified the government in advance of its intent to offer the statement, or made an attempt secure James' presence at trial.  (*Id.* at 1180-81.)

As to the reasonableness of counsel's conduct, it is difficult to fault counsel for not attempting to locate a witness who had already been identified by the prosecutor as a witness and that the prosecutor intended to present at trial.  Petitioner's counsel could have reasonably assumed that the prosecutor would ensure James' presence at the trial.  Indeed, Petitioner offers no reason to believe that his counsel would have been more effective in locating James than the police.

Arguably, Petitioner's counsel should have taken additional steps to ensure that Petitioner could still use James' statement to the police if James became unavailable to testify, but Petitioner has not demonstrated that trial counsel's conduct prejudiced him.  James' statements (as they are recorded in the police report) would have provided weak support for Petitioner's defense. They do not directly contradict any of the testimony provided by James' mother and brother. James' failure to recollect certain incidents is not the same as denying that they occurred.  Thus,

33

even if James Harris had given testimony to the jury that is consistent with the police report, it is not reasonably likely that the outcome of the trial would have been any different.  Accordingly, Petitioner's claim is meritless.

### D.  Expert Testimony

Petitioner asserts that his counsel should have presented experts to challenge the state's theory that the bullet fragment discovered in Arnett's body came from a pistol owned by Petitioner.  Detective Reinhard Pope, a forensic expert in firearms and tool marks identification, testified that the bullet fragment found in Arnett's skull came from a .38 or .357 caliber weapon. (Trial Tr. 932.)  Pope also determined that a fired bullet discovered on Petitioner's property had "class rifling characteristics" similar to the bullet recovered from Arnett's body.  (*Id.* at 934.)

Petitioner asserts that a defense expert would have been helpful because there were many facts that were not resolved by the expert witnesses who testified, such as whether a silencer was used, the distance of the shooter from the victim, whether a .38 revolver would have had the same impact as a .357 Magnum, and whether a shot fired from Petitioner's revolver would have exited the victim's skull.  However, Petitioner merely speculates that expert testimony would have been helpful.  He does not indicate what testimony an expert could have provided.  This is not sufficient to show deficient performance or prejudice.  *See Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) ("Speculation cannot suffice to establish the requisite prejudice."); *Goins v. Warden, Perry Corr. Inst.*, 576 F. App'x 167, 173 (4th Cir. 2014) ("[Petitioner's] failure to [show] what an expert witness would have testified regarding the mental health evidence . . . reduces any claim of prejudice to mere speculation and is fatal to his claim."); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure

to call a witness, the petitioner must . . . set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Petitioner also contends that his trial attorney failed to effectively cross-examine the state's expert witnesses.  This claim is meritless because it is vague and conclusory.

### E.  Daniel and Kathy Shepherd

Petitioner contends that his counsel should have discovered the Shepherds' "deal" with the government.  The claim is meritless for the reasons discussed in Section III.C. above. Petitioner has not shown that there was such a deal or that, even if one existed, Petitioner was prejudiced by the failure to disclose it at trial.

### F.  Advice not to testify

Petitioner asserts that his attorney gave him poor advice, telling him that he should not testify because the government would use his "criminal past" to impeach him.  (Am. Pet., PageID.638.)  Petitioner asserts that this was bad advice because the government used his criminal past against him anyway, even though he did not testify.  He contends that he would have testified if not for counsel's advice.

There was nothing improper about counsel's advice.  Counsel correctly informed Petitioner that testifying would put his credibility into issue and that the state could attempt to impeach his credibility by introducing relevant evidence of Petitioner's prior criminal activity.  *See* Mich. R. Evid. 609 (permitting the use of evidence of certain crimes from a witness' criminal history as a means to impeach that witness).

Furthermore, even if counsel misinformed Petitioner about whether the state could introduce evidence of his prior acts, that advice could not have affected his decision not to testify, because he waived his right to testify *after* the state presented its case.  The court inquired whether

he wished to testify and he responded that he did not wish to do so.  (Trial Tr. 1293.)  By that time, he was aware of the evidence that the state had presented against him.  In other words, he was aware of the alleged error in counsel's advice.  He knew that the state could introduce evidence of his prior acts.  If he thought that his testimony would have been helpful, he could have exercised his right to testify at that time.  He chose not to.  Thus, there is no merit to Petitioner's suggestion that counsel's purportedly erroneous advice caused him not to testify.  Accordingly, Petitioner has not established objectively unreasonable performance by his counsel or prejudice to the outcome of his proceedings stemming from his counsel's advice.

### G.  Failing to Object to Prosecutor's Statements

Petitioner contends that the prosecutor improperly argued to the jury that she did not have to prove intent for Petitioner's felony-murder charge, and improperly commented on evidence that was not in the record.  He contends that counsel should have objected to these statements.

#### 1.  Intent for Felony Murder

In her closing argument, the prosecutor stated

[I]n this case you are going to get a first degree, premeditated murder instruction. He's going to read to you – Judge Miller is – all of the elements of that but I'm going to focus on two things.  The intent to kill was premeditated and it was thought out beforehand and it was deliberate.

*** 

His intent was to kill, execute the only witness to the robbery.  That's the first degree premeditated murder instruction.

You're going to hear an additional instruction for a different charge, felony murder. The judge will read you the full instruction, I'm going to simplify it.  Felony murder, robbery and death and that's all I have to show.  That a robbery occurred and that Christopher Arnett was killed during the course of the robbery.  Period.  I don't have to show what his intent was, I don't have to show anything else, a robbery and a death.

36

(Trial Tr. 1305, 1309.)

Petitioner is correct that the prosecutor improperly stated that she did not have to show "what [Petitioner's] intent was" to establish felony murder. *See People v. Aaron*, 299 N.W.2d 304, 326 (Mich. 1980) (abolishing the common law rule that intent to commit the felony constitutes a sufficient mens rea to establish felony murder, and holding that felony murder requires a finding of "intent to kill, intent to do great bodily harm, or wanton and willful disregard of the likelihood that the natural tendency of a person's behavior is to cause death or great bodily harm"). Arguably, competent counsel should have objected to the prosecutor's glaring misstatement of the law.

Nevertheless, Petitioner cannot show prejudice, for several reasons. First, the trial court expressly instructed the jury that it was required to find intent in order to convict Petitioner of felony murder. (Trial Tr. 1399.) "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Second, the jury found Petitioner guilty of both premeditated murder *and* felony murder for the same act. (Trial Tr. 1428-29.) Thus, it necessarily found that Petitioner had the requisite intent to kill. Finally, the trial court issued only one sentence for Petitioner's murder convictions, because they are based on the same homicide. (Sent. Hr'g Tr. 27-28, ECF No. 25.) Consequently, an objection could not possibly have changed the outcome of his proceedings. He would have been convicted of first-degree murder and he would have received the same sentence for that murder.

## 2.   Evidence not in the record

During her closing argument, the prosecutor discussed a security tape from a store where Petitioner and Della Harris allegedly stopped on their way back home after Petitioner murdered Arnett. According to Della, they stopped at PS Food Mart, and Petitioner went into the

store. (Trial Tr. 438.)  The prosecutor discussed a security tape from PS Food Mart and played the

tape to the jury:

> What did Della say?  They didn't go directly to the house, they went to the PS Food
> Mart.  The PS Food Mart turned over a tape to the police and that was just in their
> routine course of the investigation and what the police thought they were getting
> was the six a.m. to two p.m. tape, and remember what Della said, "He said on the
> way back stop at that place," which she later identified as the PS Food Mart.  Well,
> we have the tape.  It's unfortunate that the tape doesn't go as long as we thought it
> did.  I'm going to show you just a small piece of this tape.  At the end of the tape it
> would appear that the time says 13:13, which would be 1:13, but as we discovered
> by looking at the entire tape the numbers are all screwed up.  We went back an hour
> and when you go back an hour it's 11:00.  It's 11:00 on the tape and then you can
> see the time change and where it should be saying 12 it now says 13 and there's no
> cut in the tape.  It ends up being a nonissue but it's important because we seized it.
> **I wish we had the tape because Jeff Ringle would be on it.**
>
> (Showing the jury the tape at 09:53:30.)
>
> . . . There's nothing for you to see on the tape but it's still important to point that
> out to you.  Because of her testimony I would submit if the tape had gone on longer,
> nobody wants that tape more than I do, it's not of consequence but it certainly
> deserves some kind of explanation.

(Trial Tr. 1310-11 (emphasis added).)

Contrary to Petitioner's assertion, the prosecutor did not rely on evidence that was

not admitted at trial to bolster the prosecution's case.  Instead, the prosecutor argued, based on

Della Harris' testimony, that *if* the prosecutor possessed a tape that covered the relevant time

period, the tape would have shown that Petitioner was present at the PS Food Mart.  A prosecutor

is allowed to draw reasonable inferences from the evidence, and that was a reasonable inference

to make.  This would be a different case if the prosecutor had argued that she saw Petitioner on the

tape, and then she failed to present that tape to the jury.  In that case, she would have been

presenting herself as a source of evidence that Petitioner did not have an opportunity to challenge.

But that did not happen here.   Thus, there was no basis for an objection.  Counsel did not act

unreasonably by failing to make a meritless objection.

For all the foregoing reasons, Petitioner's claim that he was denied the effective assistance of trial counsel is meritless.  Likewise, the state court's decision rejecting his claim was not contrary to clearly established law.

VIII.   <u>Assistance of Appellate Counsel (Habeas Issue I)</u>

Petitioner also contends that his appellate counsel was ineffective for failing to raise the other issues in this petition.  To demonstrate ineffective assistance by his appellate counsel, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness, and that this deficient performance prejudiced him, resulting in an unreliable or fundamentally unfair outcome.  *Strickland*, 466 U.S. at 687-88.  When assessing appellate counsel's performance, courts recognize that appellate counsel is not required to "raise every non-frivolous issue" on appeal.  *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003).  Appellate counsel may reasonably decide that selecting only some of the possible nonfrivolous claims will "maximize the likelihood of success on appeal."  *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 688.  Thus, appellate counsel's judgment is "presumed to be effective unless the ignored issues are clearly stronger than those presented."  *Sullivan v. United States*, 587 F. App'x 935, 944 (6th Cir. 2014).  As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance

prong where the attorney presents one argument on appeal rather than another.  *Robbins*, 528 U.S. at 289.

The state court determined that "[e]ven the most perfunctory perusal of the alleged errors [by appellate counsel] show that they are each lacking in both factual and legal merit. Appellate counsel is not ineffective for failing to raise meritless issues on appeal."  (2/7/2011 Calhoun Cty. Cir. Ct. Order 2-3.)  I agree.  Petitioner's claim regarding his appellate counsel is meritless because the other grounds for relief in this petition are also meritless.   Moreover, Petitioner has not shown that the other grounds for relief are "clearly stronger" than the three issues that were raised, one of which resulted in a remand to amend his sentence.

Accordingly, I recommend that the Court deny all of Petitioner's claims because they are meritless.

## **Certificate of Appealability**

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."   28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Id.*   "A petitioner satisfies this

40

standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied as meritless.  I further recommend that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

Dated:  December 7, 2018                               /s/ Ray Kent
                                                       United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).